NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent.  It is a public record.

# United States Court of Appeals for the Federal Circuit

05-3315

FRED J. FAGERGREN,

Petitioner,

v.

DEPARTMENT OF THE INTERIOR,

Respondent.

_____

DECIDED:  January 11, 2006
_____

Before MICHEL, <u>Chief Judge</u>, SCHALL and GAJARSA, <u>Circuit Judges</u>.

PER CURIAM.

Fred J. Fagergren ("Fagergren") petitions this court to review the final decision of the Merit Systems Protection Board ("Board") sustaining the Department of the Interior's ("agency") denial of his request for law enforcement officer ("LEO") enhancement retirement annuity benefits.  <u>Fagergren v. Dep't of Interior</u>, No. DE-0831-03-0469-I-1 M.S.P.R. (June 14, 2005) ("<u>Final Order</u>").  Because the Board properly determined that he failed to show that LEO duties constituted his primary duties, we <u>affirm</u>.

I

Fagergren was a GS-0025-14 park manager with the National Park Service ("NPS"). From April 29, 1973, to October 25, 1975, he was employed by the agency as a park ranger at Effigy Mounds National Monument ("Effigy Mounds") in Iowa. In October 1975, Fagergren was promoted to the position of park manager at the Mound City Group National Monument ("Mound City") in Chillicothe, Ohio. He remained in that position until March 1981, when the agency promoted him to the position of park manager at Big Cypress National Preserve ("Big Cypress") in Naples, Florida. In 1991, Fagergren was again promoted to park manager at Bryce Canyon National Park ("Bryce Canyon") in Utah.

Fagergren, who is covered by the Civil Service Retirement System ("CSRS"), retired on April 2, 2002 at age 57. Fagergren requested primary LEO enhancement retirement annuity benefits for his service at the Effigy Mounds and Mound City positions, and secondary LEO coverage for his remaining federal service. The agency denied his request on the grounds that the position descriptions and his duties did not support a finding that he was entitled to LEO coverage.

Fagergren timely appealed to the Board. In an initial decision, the Administrative Judge ("AJ") reversed the agency's decision and found that Fagergren was entitled to primary LEO coverage because he had shown he performed primary law enforcement duties at Effigy Mounds and Mound City. Fagergren v. Dep't of Interior, No. DE-0831-03-0469-I-1 M.S.P.R. (May 21, 2004) ("Initial Decision"). The agency petitioned for full Board review of the initial decision. On June 14, 2005, the full Board reversed the AJ's decision and sustained the agency's determination that Fagergren was not entitled to

LEO service credit. <u>Fagergren</u>, <u>Final Order</u>, slip op. at 1. Fagergren timely appealed and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (2000).

## II

## A

Our scope of review in an appeal from a Board decision is limited. This court must affirm the Board's decision unless it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (2000); <u>see</u> <u>Walls v. Merit Sys. Prot. Bd.</u>, 29 F.3d 1578, 1581 (Fed. Cir. 1994). The determination of factual issues and the drawing of appropriate inferences from them is for the Board, not for the reviewing court. <u>Hannon v. Dep't of Treasury</u>, 264 F.3d 1050, 1054 (Fed. Cir. 2001). "It is not for this court to reweigh the evidence before the Board." <u>Henry v. Dep't of Navy</u>, 902 F.2d 949, 951 (Fed. Cir. 1990).

## B

A LEO is defined as "an employee the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." 5 U.S.C. § 8331(20) (2000). We strictly construe the definition of law enforcement officer because the program is more costly to the government than traditional retirement plans and often results in the early retirement of important employees. <u>Watson v. Dep't of Navy</u>, 262 F.3d 1292, 1298 (Fed. Cir. 2001).

The Office of Personnel Management ("OPM") promulgated regulations pursuant to 5 U.S.C. § 8331 to determine the eligibility of employees for LEO status under the CSRS. See 5 C.F.R. §§ 831.901, 831.902 (2005). OPM created a three-prong test to determine which duties are considered "primary duties" of a particular position: (1) whether the duties are paramount in influence or weight, that is, whether they constitute basic reasons for the existence of the position; (2) whether the duties occupy a substantial portion of the individual's working time over a typical work cycle; and (3) whether the duties are assigned on a regular and recurring basis. 5 C.F.R. § 831.902 (2005). All three criteria must be met to demonstrate LEO eligibility. Watson, 262 F.3d at 1299.

In general, if an employee spends at least fifty percent of his time performing certain duties, those duties are his primary duties. 5 C.F.R. § 831.902 (2005). The regulation further provides that "maintaining law and order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of offenses against the criminal laws of the United States" are not LEO primary duties. Id.

When determining whether the duties are paramount in influence or weight, the Board has developed a "position-oriented" approach, assessing both the official position documentation and the employee's actual day-to-day duties. Watson, 262 F.3d at 1300. In evaluating whether the LEO duties occupied a substantial portion of the employee's working time and whether the duties were assigned on a regular basis, the Board has applied the six-factor Bingaman approach. See Bingaman v. Dep't of Treasury, 127 F.3d 1431, 1436 (Fed. Cir. 1997). Under this approach, the Board

considers whether the employee commonly: (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects; (4) works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to maintain a level of physical fitness. Id.

We have held that the most probative factors for determining LEO coverage are: (1) whether the officer is merely guarding life and property, or whether he is instead more frequently pursuing or detaining criminals; (2) whether there is an early mandatory retirement age; (3) whether there is a youthful maximum entry age; (4) whether the job is physically demanding so as to require a youthful workforce; and (5) whether the officer is exposed to hazard or danger. Watson, 262 F.3d at 1303.

Fagergren contends that the Board erred in denying him LEO coverage because it focused only on the official description of his positions and not his actual day-to-day duties. To support his contention, Fagergren offers a lengthy explanation of his day-to-day duties at Effigy Mounds and Mound City. Fagergren also spends considerable effort arguing that his day-to-day duties involved criminal investigations. The Board adequately considered both the official position descriptions and Fagergren's day-to-day duties in determining whether the majority of his time was spent performing LEO duties. The Board acknowledged that Fagergren's duties included not only those listed in the official description, but other duties including patrolling for ginseng poachers, wildlife poachers, and tree poachers, and assuring that cultural artifacts and burial mounds were protected. Fagergren, Final Order, slip op. at 5. Nevertheless, the Board found that most of his duty performance involved maintaining order, protecting life and property, and guarding against or inspecting for violations of law. Id. at 6. Thus, the

Board did not err in denying Fagergren LEO coverage because it sufficiently considered all aspects of his day-to-day duties and correctly determined that the majority of his time did not involve the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States. Id.

Fagergren further contends that he had frequent contact with criminal suspects and is, therefore, eligible for LEO credit. Fagergren supports his contention by describing several encounters with potential criminal suspects. Fagergren does not adequately explain how the Board erred in this regard. The Board assessed the encounters described by Fagergren and correctly determined that he came in contact with criminal suspects or interrogated witnesses only a few times over several years. Fagergren does not claim that his encounters with criminal suspects were more frequent than the Board had determined. Thus, Fagergren fails to show that the Board erred in finding that he was ineligible for LEO credit because he did not have frequent encounters with criminal suspects. Id. at 6.

Fagergren next alleges that he was entitled to LEO coverage because he was required to maintain a level of physical fitness. Fagergren supports his contention by explaining that he maintained a level of physical fitness on his own, and was required to be physically fit when participating on a special events team responsible for providing crowd control and protecting dignitaries. The OPM regulations expressly state that duties of an emergency, incidental, or temporary nature are not primary. See 5 C.F.R. § 831.902 (2005). The Board correctly found, and Fagergren acknowledged, that his position did not require a level of physical fitness. Fagergren, Final Order, slip op. at 6.

Moreover, the Board correctly determined that his participation on the special events team was temporary and thus, could not be considered primary.  Id.

Fagergren further contends that his position inherently had age limitations and was hazardous.  Although Fagergen acknowledges that there was no official age limitation for his position, he contends that the hazardous nature of his day-to-day duties inherently resulted in an age limitation.  Fagergren's arguments fail to show that an express age limitation existed, or that his duties were particularly hazardous such that only a person of a certain age could perform them.  Again, the Board sufficiently considered the evidence surrounding these factors and found they did not entitle Fagergren to LEO credit.  Id.  Thus, Fagergren has failed to show that the Board erred in denying him LEO credit on these grounds.

Finally, Fagergren asserts that because he worked long periods without breaks, was on call 24 hours a day, and was authorized and routinely carried a firearm, he was entitled to LEO coverage.  While these Bingaman factors weigh in favor of granting LEO coverage, the Board found, and we agree, that these factors are less probative because they do not always distinguish LEO work from non-LEO work.  Fagergren, Final Order, slip op. at 6; See Watson, 262 F.3d at 1302.

All remaining arguments alleged by Fagergren, including inter alia, the grant of LEO coverage to a similarly situated employee, request for secondary LEO coverage, the nature of his day-to-day duties, essentially ask us to re-weigh facts previously considered by the Board, which we will not do.  See Henry, 902 F.2d at 951.  The Board adequately considered all of the evidence and determined that Fagergren has not shown that he spent a majority of his time performing LEO duties.  Because Fagergren

05-3315                                   7

has not shown the Board erred by denying him LEO credit and its decision is supported by substantial evidence, we affirm the decision of the Board.

Each side shall bear its own costs.